**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CONSOLIDATED CASE NOS. 26-21889-CIV-ALTONAGA**
**26-22161-CIV-ALTONAGA**
**26-22053-CIV-ALTONAGA**
**26-22154-CIV-ALTONAGA**

ABEL CARVAJAL, *et al.*,

Plaintiffs,

v.

JEANETTE M. NUÑEZ,

Defendant.

# DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' AMENDED VERIFIED MOTION FOR PRELIMINARY INJUNCTION

Edward H. Trent (FBN 957186)
etrent@schaerr-jaffe.com
H. Christopher Bartolomucci (*pro hac vice*)
cbartolomucci@schaerr-jaffe.com
Justin A. Miller (*pro hac vice*)
jmiller@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136

*Counsel for Defendant Jeanette M. Nuñez*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... ii

MEMORANDUM ..... 1

INTRODUCTION ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 4

I. Plaintiffs Are Not Likely to Succeed on the Merits. ..... 5

A. Ratchkauskas ..... 10

B. Gonzalez ..... 10

C. Carvajal ..... 12

D. Mojena ..... 13

II. Plaintiffs Have Not Shown Irreparable Injury. ..... 15

III. The Balance of Harms and Public Interest Favors the University. ..... 17

CONCLUSION ..... 18

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) ........ 17

*Boim v. Fulton Cnty. Sch. Dist.*,
494 F.3d 978 (11th Cir. 2007) ........ 1, 6, 10

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ........ 5

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ........ 7

*Burns v. Town of Palm Beach*,
999 F.3d 1317 (11th Cir. 2021) ........ 5

*Counterman v. Colorado*,
600 U.S. 66 (2023) ........ 7

*Damsky v. Summerlin*,
No. 25-14171, 2026 WL 75122 (11th Cir. Jan. 8, 2026) ........ *passim*

*Doe v. Valencia College*,
903 F.3d 1220 (11th Cir. 2018) ........ 6, 7

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 16

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ........ 17

*Gonzalez v. Governor of Georgia*,
978 F.3d 1266 (11th Cir. 2020) ........ 5

*Healy v. James*,
408 U.S. 169 (1972) ........ 9

*Holley v. Seminole Cnty. Sch. Dist.*,
755 F.2d 1492 (11th Cir. 1985) ........ 5

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) ........ 16

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
594 U.S. 180 (2021) ........ *passim*

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) .......... 17

*Morse v. Frederick*,
551 U.S. 393 (2007) .......... 1, 6

*Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) .......... 15

*Nugent v. Camus*,
No. 3:25-CV-170-BL-CWB, 2026 WL 1108897 (M.D. Ala. Mar. 6, 2026) .......... 17

*Parker v. Jud. Inquiry Comm'n of Ala.*,
295 F. Supp. 3d 1292 (M.D. Ala. 2018) .......... 16

*Powers v. Sec'y, Fla. Dep't of Corr.*,
691 F. App'x 581 (11th Cir. 2017) .......... 17

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .......... 15, 16

*Smith v. Fla. Agric. & Mech. Univ. Bd. of Trs.*,
No. 24-12823, 2026 WL 981236 (11th Cir. Apr. 13, 2026) .......... 15, 16

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) .......... 5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .......... 1, 6, 9, 18

*Van Arsdel v. Tex. A&M Univ.*,
628 F.2d 344 (5th Cir. 1980) .......... 15

*Widmar v. Vincent*,
454 U.S. 263 (1981) .......... 9

**Rule**

Fed. R. Civ. P. 65 .......... 2

## MEMORANDUM

Defendant Jeanette M. Nuñez, in her official capacity as President of Florida International University ("FIU"), responds to Plaintiffs' Amended Verified Motion for Preliminary Injunction (ECF 93).

## INTRODUCTION

Plaintiffs' motion depends on a premise the record refutes—that FIU punished four students because their speech was offensive, racist, antisemitic, or politically objectionable. It did not. FIU brought individualized charges under particular provisions of its Student Conduct and Honor Code and adjudicated each through a separate hearing that produced different charges, different findings, and different sanctions. Decl. of Devin Parra ¶¶ 7–8, 24–64 ("Parra Decl.").

FIU's response was justified under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), which holds that students have no First Amendment right to materially and substantially disrupt the learning environment. Applying *Tinker*, the Eleventh Circuit has recognized that students have no right "to knowingly make comments … that reasonably could be perceived as a threat of school violence." *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007). And universities retain a significant interest addressing in "threats aimed at teachers or other students" and in serious or severe harassment targeting the campus community, even for off-campus speech. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188 (2021). Discipline may also be imposed for student speech that is reasonable viewed by school administrators as promoting illegal activity. *See Morse v. Frederick*, 551 U.S. 393, 403, 408 (2007). The developed record confirms that those circumstances exist here.

Plaintiffs erroneously argue that this Court's partial grant and denial of Defendant's motion to dismiss "materially changes the posture of Plaintiffs' request for preliminary relief." ECF 93 at 4. When this Court declined to dismiss Plaintiffs' First Amendment claim, it decided that

resolving that issue was "better suited to a developed factual record." Order at 1 n.1 (ECF 91). The Court thus reserved, rather than resolved, whether FIU's disciplinary decisions rested on protected expression or on conduct the University may regulate. *Id.* at 14. That developed record is now before the Court: the complete Group Chat 1 and Group Chat 2, the five administrative-hearing transcripts, the disciplinary record, and declarations from Devin Parra and Dr. Emmanuele Bowles. Because the Court has consolidated the trial on the merits with this hearing under Federal Rule of Civil Procedure 65(a)(2), with trial set for October 28–29, 2026, *see* ECF 103, the question is no longer whether Plaintiffs' allegations were plausible. It is whether, on the evidence, they can prove a constitutional violation. They cannot. Nor can they show that the equities and public interest favor granting preliminary relief. The University made a measured response to communications it reasonably understood as implicating campus safety. The motion should be denied.

## BACKGROUND

During the Fall 2025 semester, FIU began receiving reports about private group-chat communications involving Plaintiffs and other students. ECF 105 ¶ 22. The communications spanned more than one chat. Abel Carvajal created and administered the chat designated Group Chat 1, which operated including between September 22 and October 9, 2025. Parra Decl. Ex. 1 at GC1_0001. A separate Group Chat 2, operated including November 28 through December 16, 2025, involved a different, overlapping set of participants. Parra Decl. Ex. 2. The statements for which Ratchkauskas and Mojena were charged appear in Group Chat 2. Gonzalez participated in both chats. In approximately February 2026, a participant disclosed the communications to the press, with "news br[eaking]" on March 4, 2026. Carvajal Admin. Hrg. Tr. at 102:3–4, 136:13–14, 137:17–19.

FIU addressed the matter through its ordinary student-conduct process. Devin Parra, who directs the Office of Student Conduct and Academic Integrity, determined the charges and brought

different charges against different students under different Code provisions. Parra Decl. ¶¶ 1, 7–8, 24, 38, 45, 52, 60; *see also* Parra Decl. Exs. 5, 9, 13, 17, 21 (Charge Ltrs.). The Code prohibits various "Conduct Violations" including "Assisting," "Endangerment," and "Personal Abuse." Parra Decl. ¶ 15; Code §§ 5(ii), 5(x), 5(xx) (Parra Decl. Ex. 4 at 8, 10, 13). Those terms are defined as follows:

- "Assisting" is defined as "Any affirmative act which aids, attempts, promotes, conceals, or facilitates any act prohibited by this Code." Parra Decl. ¶ 16 (quoting Code § 5(ii) (Parra Decl. Ex. 4 at 8)).
- "Endangerment" is defined to include "Engag[ing] in any action(s) that endangers the health, safety or welfare of others." Parra Decl. ¶ 17 (quoting Code § 5(x)(ii) (Parra Decl. Ex. 4 at 10)).
- "Personal Abuse" is defined to include: "Verbal or written abuse, threats, intimidation, and/or Coercion that objectively endangers the health, safety or well-being of others and which is not covered by FIU Regulation 105. Using fighting words or statements which reasonably endanger the health and safety of any person that are not protected speech may result in University action. Conduct directed at any person, including a member of the University community, which is intended to, or would reasonably, cause fear, distress, injury or intimidation to a person, or would place a reasonable person in fear of injury or death." Parra Decl. ¶ 18 (quoting Code § 5(xx)(i) (Parra Decl. Ex. 4 at 13)).

The Code prohibits certain alcohol-related and drug-related conduct, including driving under the influence or possessing or using illegal drugs. *Id.* ¶¶ 19–21 (citing Code §§ 5(iv)(xi), 5(ix)(i) (Parra Decl. Ex. 4 at 8, 10)). The Code also prohibits "'Failure to Comply,' which is defined to include 'Failure to comply with a request or directive of a University Official or non-University

law enforcement official in the performance of their duty.'" *Id.* ¶ 22 (quoting Code § 5(xi)(i) (Parra Decl. Ex. 4 at 10)). And it prohibits "'Other Violations,' which is defined to include 'Violations of federal and/or state laws, local ordinance, and/or Policy not already listed above.'" *Id.* ¶ 23 (quoting Code § 5(xxxi)(ii) (Parra Decl. Ex. 4 at 16)).

The proceedings and dispositions were individualized. Each Plaintiff received a separate administrative hearing before Hearing Officers Jennifer Gamarra or Patricia Santana-Leyva, followed by an appeal. *Id.* ¶¶ 25, 36, 39, 43, 46, 50, 53, 58, 61, 63. Those appeals were denied.

Ratchkauskas was found responsible for Personal Abuse, Assisting, and Endangerment and was expelled effective May 29, 2026. Parra Decl. ¶ 42 & Ex. 11.

Carvajal was found responsible for Assisting and suspended from May 11, 2026 until May 11, 2028. Parra Decl. ¶ 57 & Ex. 19.

Gonzalez was found responsible for Personal Abuse, Endangerment, Alcohol, and Drugs—but *not* responsible for Other Violations—and suspended and suspended from May 11, 2026 until May 11, 2028. Parra Decl. ¶ 35 & Ex. 7. He was then separately charged with Failure to Comply after submitting coursework in violation of the terms of his suspension and was expelled effective July 1, 2026. Parra Decl. ¶¶ 60–62 & Exs. 21, 23.

Mojena was found responsible for Personal Abuse and suspended from June 2, 2026 until December 10, 2026. Parra Decl. ¶ 49 & Ex. 15.

Only Count I, Plaintiffs' official-capacity First Amendment claim, remains, ECF 91 at 22, and the Court has consolidated the trial of that claim with this hearing, ECF 103.

## ARGUMENT

A preliminary injunction is an extraordinary remedy that requires Plaintiffs to establish each of four requirements: a substantial likelihood of success on the merits, irreparable harm, a balance of equities in their favor, and consistency with the public interest. *Gonzalez v. Governor*

*of Georgia*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). Likelihood of success is the controlling inquiry, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022), and because the Court will decide the merits on this same record, Plaintiffs' inability to show a likely constitutional violation is dispositive.

Because this is a First Amendment case, the Court independently examines the whole record to determine whether the speech FIU regulated was protected; that question "is not merely a question for the trier of fact." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984); *Holley v. Seminole Cnty. Sch. Dist.*, 755 F.2d 1492, 1505 (11th Cir. 1985). That independent review is "result-neutral." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1331 (11th Cir. 2021). The Court decides the constitutional question for itself, on the full developed record now before it, including the evidence of the statements' context and their concrete effects.

**I. Plaintiffs Are Not Likely to Succeed on the Merits.**

The developed record establishes that FIU's disciplinary decisions were constitutionally permissible under *Tinker* and its progeny. The governing framework permits a university to respond to student communications that materially disrupt the educational environment; that are reasonably seen as promoting illegal activity; or reasonably threaten its safety and orderly operation, including when the communications occur off campus. That framework governs both the disruption FIU experienced and its individualized response to each Plaintiff.

Plaintiffs' legal arguments here (ECF 93 at 4–10) again conspicuously ignore the Eleventh Circuit's most recent pronouncement on disruptive, harassing, and threatening speech in the university setting. *See Damsky v. Summerlin*, No. 25-14171, 2026 WL 75122 (11th Cir. Jan. 8, 2026) (granting staying of preliminary injunction pending appeal). Defendant has noted this glaring omission before, *see* ECF 51 at 6; ECF 86 at 14, yet Plaintiffs still refuse to acknowledge the Eleventh Circuit's decision.

Plaintiffs contend that because their speech occurred "off-campus," FIU's "interests are diminished." ECF 93 at 9. Not so. In its landmark *Tinker* decision, the Supreme Court held that "conduct by [a] student, *in class or out of it*, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513 (emphasis added). And the Eleventh Circuit has recognized that *Tinker* applies in the university setting. *Doe v. Valencia College*, 903 F.3d 1220, 1230 (11th Cir. 2018); *Damsky*, 2026 WL 75122, at *2 n.4.

In *Damsky*, the Eleventh Circuit recognized that *Tinker* permits regulation where student speech causes a material and substantial disruption or invades the rights of others. *Damsky*, 2026 WL 75122, at *2 (citing *Tinker*, 393 U.S. at 509, 513). And *Damsky* further recognized that a university may restrict student speech that could be "reasonably viewed as promoting illegal activity," *id.* at *4 (citing *Morse*, 551 U.S. at 403, 408), or that "reasonably could be perceived as a threat of school violence, whether general or specific," *id.* at *2 (quoting *Boim*, 494 F.3d at 984).

The inquiry is objective—whether the speech "could reasonably be construed" as a threat, even if the speaker later disavows that meaning. *Boim*, 494 F.3d at 985. The dispositive question is whether "a reasonable interpretation of the speech caused a material disruption." *Damsky*, 2026 WL 75122, at *2. In *Damsky*, the panel also recognized that a university may regulate at least some speech reasonably interpreted as promoting unlawful conduct, including "extralegal violence." *Id.* at *3. The Eleventh Circuit has recently interpreted these precedents in *Damsky*, which persuasively confirms in a closely analogous university-speech setting that discipline may be

sustained under *Tinker* without resolving whether the student's expression was a criminal true threat. *Id.* at *2.[1]

Following *Tinker*, the Eleventh Circuit held in *Valencia College* that "[t]here is no absolute bar against schools disciplining a student for off-campus conduct that violates the rights of another student." 903 F.3d at 1231. The Eleventh Circuit rejected a suspended student's argument that "the school was powerless to do anything about his misbehavior because he did it all while he was off campus" during "the break between summer and fall classes." *Id.* The Eleventh Circuit explained in *Valencia College* that "*Tinker* does not foreclose a school from regulating all off-campus conduct." *Id.* The Eleventh Circuit reaffirmed these principles earlier this year in *Damsky*. *See Damsky*, 2026 WL 75122, at *4 ("The fact that Damsky's speech occurred online instead of on campus does not mean that UF cannot regulate the speech[.]").

*Mahanoy* is not to the contrary, as the *Damsky* court recognized. 2026 WL 75122, at *4. In *Mahanoy*, which involved a student's off-campus use of social media, the Supreme Court rejected the idea that "the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." 594 U.S. at 188. The Court instead confirmed that "[t]he school's regulatory interests remain significant in some off-campus circumstances." *Id*. The Court cited "several types of off-campus behavior that

[1] Plaintiffs emphasize that their statements were not criminal true threats. ECF 93 at 3, 5–6. But *Counterman v. Colorado* governs the mental state required to impose *criminal* liability for a true threat. 600 U.S. 66, 69 (2023). It does not require a university to satisfy the criminal true-threat standard before responding under *Tinker* to speech that materially disrupts or is reasonably perceived as threatening. FIU need not and does not contend that any Plaintiff committed a criminal true threat. To the extent Plaintiffs invoke *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam), and the general First Amendment rule protecting advocacy of unlawful action, FIU does not contend that generalized advocacy of violence is categorically unprotected. FIU's point is that the student-speech framework, and the concrete disruption and safety interests actually presented here, govern the analysis.

may call for school regulation," including "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students[.]" *Id.*

The developed record confirms that FIU confronted substantial disruption to its educational environment after the group chats became public in March 2026. FIU's discipline did not rest on the offensive content of the group chats or on generalized concerns about campus safety. The record documents concrete interference with students' ability to participate in their education, as well as operational measures undertaken in response to the communications.

The disruption was widespread. FIU received more than sixty incident reports concerning the messages, including reports from students who felt threatened or afraid to attend classes or move about campus. University officials held eight meetings with student-organization leaders, devoted substantial staff time to responding to complaints and coordinating supportive measures, and increased police patrols. Bowles Decl. ¶¶ 7–8. Bowles, who has worked at FIU for nearly twenty years, described the resulting disruption and fear as more severe than any student-conduct incident she could recall. *Id.* ¶ 18.

This disruption included a law student enrolled in a class with Carvajal who reported that the communications left her persistently unable to concentrate, her attention shifting from the lecture to concern for her safety, "persistent from the week of March 4, 2026, when I initially was made aware of the situation to the very last day of class, April 15, 2026, and made it difficult for me to fully engage in my legal education." Bowles Decl. ¶¶ 11–12 (quoting Carvajal Admin. Hrg. Tr. at 117:20–119:11 (Parra Decl. Ex. 18)). The student's professor reported that she was "in tears and visibly shaken," could focus when the Mr. Carvajal was absent from the class they shared, but "cannot concentrate" when he was present, and that two other students were likewise afraid; the professor concluded that the situation was "materially affecting multiple students' ability to

participate and engage in class," and the University weighed remote-attendance accommodations. Bowles Decl. ¶¶ 13–14. A practicing Jewish faculty member reported that he was "deeply concerned for his safety and for the safety of students." *Id.* ¶ 15. The University increased police presence and patrols on campus. *Id.* ¶ 8. This is impairment of the educational function and of campus safety—the disruption *Tinker* contemplates, and the kind of showing the Eleventh Circuit found sufficient in *Damsky*. *See* 2026 WL 75122, at *2.

The Supreme Court has long held that a university may discipline its students for "First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." *Widmar v. Vincent*, 454 U.S. 263, 277 (1981) (citing *Healy v. James*, 408 U.S. 169, 188–89 (1972)). University students' "First Amendment rights must be analyzed 'in light of the special characteristics of the school environment.'" *Id*. at 267 n.5 (quoting *Tinker*, 393 U.S. at 506). These principles establish the framework for assessing FIU's response. And under that framework, the University's disciplinary decisions were justified as to each Plaintiff, considering that student's own conduct and the surrounding circumstances.

FIU's disciplinary decisions reflect four distinct applications of that framework. FIU found Carvajal responsible for Assisting, Parra Decl. Ex. 19 at 1; Ratchkauskas responsible for Personal Abuse, Assisting, and Endangerment, Parra Decl. Ex. 11 at 1; Mojena responsible for Personal Abuse, Parra Decl. Ex. 15 at 1; and Gonzalez responsible for Personal Abuse and Endangerment (and other violations not involving his speech), Parra Decl. Ex. 7 at 1. These are precisely the off-campus circumstances the Supreme Court left outside *Mahanoy*, and in which a university's "regulatory interests remain significant." *Mahanoy*, 594 U.S. at 188; *see also Damsky*, 2026 WL 75122, at *4 (citing *Mahanoy*). The disciplinary records confirm that FIU responded to each

Plaintiff's conduct under the governing student-speech framework, rather than treating offensive expression as categorically unprotected.

**A. Ratchkauskas**

Ratchkauskas's statements are threats by any measure. He wrote in the group chat that a student "just has to Swiss cheese the professor," and then "[a]ir them out." Parra Decl. Ex. 2 at GC2_043. Asked what that meant, he answered: "Putting holes in them via means of firearm." *Id.* at GC2_044. Days later he proposed: "Let's go blow up dolphin mall with an explosive device or something," with even that version of his message having been edited. Parra Decl. ¶ 41; Parra Decl. Ex. 2 at GC2_291. A call to shoot a professor and bomb a shopping mall is not "controversial" protected expression; it is a threat of violence targeting the University community that FIU was entitled to address. The standard here is whether FIU could *reasonably* interpret the statements as referring to violence. *Boim*, 494 F.3d at 985. And Ratchkauskas's own explanation makes FIU's interpretation reasonable. Parra Ex. 2 at GC2_043–44.

**B. Gonzalez**

Gonzalez's challenge founders first on grounds that have nothing to do with speech. He was found responsible for Endangerment, Alcohol, and Drugs. Parra Decl. ¶ 35 & Ex. 7 at 1. Gonzalez responded to a chat member's question, "How illegal is drunk driving a golf cart," with "Ive done it" and "A lot of." Parra Decl. ¶ 33 (quoting Parra Decl. Ex. 2 at GC2_396). He elaborated that he "do[es] it all the time lollll" and "Especially at the pig roasts" and that he "[a]lmost hit those famous Hispanic old dancing couple." *Id.* (quoting Parra Decl. Ex. 2 at GC2_396). He continued:

> "You should've seen me zooming up and down bird on that golf cart"; "(I took a wrong turn and ended up in the middle of bird)"; "Drunker than I'd care to admit." [Ex. 2] at GC2_397. He then continued: "Meanwhile I was drunk driving and nearly

> running over small children" and "This one little nigglet ran right into the cart." *Id.* He also posted: "And the mom was like Yamal do you NOT see the nice young man in the cart" and "And I was like no no madam it's my fault (it was not)." *Id.* On December 15, 2025, a group chat member, "Ethan," posted "Bear in mind throughout this conversation we still have Dariel admitting to almost running over a child while drunk driving a golf cart pinned to the top of this." *Id.* at GC2_440.

Parra Decl. ¶ 33; *see also* Parra Decl. Ex. 2 at GC2_397, 440. Gonzalez further discussed having smoked pot on campus. He posted a series of messages: "Fellas I am so tired"; "I got home at 6"; "We left panther cave at like 12?"; "We were at the strip club until like 3ish"; "But then we went to eat"; "And we got pot"; "And smoked on campus." Parra Decl. ¶ 34 & Ex. 2 at GC2_406.

Gonzalez was separately found responsible for Failure to Comply, after he submitted coursework during his suspension, and was expelled on that basis—a sanction he does not challenge here and that no First Amendment theory touches. Parra Decl. ¶¶ 60–64 & Decl. Exs. 21–24. Those independent findings render his request for reinstatement ineffectual, regardless of the merits of his First Amendment claim.

The Personal Abuse finding stands separately. Gonzalez's statements were not limited to the remarks discussed at his hearing. In Group Chat 1, he wrote "Kill negros soon?" and "Total negro death," immediately after posting a link to the Anti-Defamation League's explanation of the latter slogan. Parra Decl. ¶¶ 26–27 & Ex. 1 at GC1_0076. Soon after Gonzalez's posts, another chat participant posted the following:

> Kill niggers. Behead niggers. Roundhouse kick a nigger into the concrete. Slam dunk a nigger baby into the trashcan. Crucify filthy blacks. Defecate in a niggers food. Launch niggers into the sun. Stir fry niggers in a wok. Toss niggers into active volcanoes. Urinate into a niggers gas tank. Judo throw niggers into a wood chipper. Twist niggers heads off. Report niggers to the IRS. Karate chop niggers in half. Curb stomp pregnant black niggers. Trap niggers in quicksand. Crush niggers in the trash compactor. Liquefy niggers in a vat of acid. Eat niggers. Dissect niggers. Exterminate niggers in the gas chamber. Stomp nigger skulls with steel toed boots. Cremate niggers in the oven. Lobotomize niggers. Mandatory abortions for niggers. Grind nigger fetuses in the garbage disposal. Drown niggers in fried chicken grease. Vaporize niggers with a ray gun. Kick old niggers down the stairs. Feed niggers to alligators. Slice niggers with a katana.

Parra Decl. ¶ 28 & Ex. 1 at GC1_0076–77. Gonzalez responded within seconds: "How edgy." Parra Decl. ¶ 29 & Ex. 1 at GC1_0077.

Gonzalez also told another participant to "Kill yourself asap," and responded "Kill" when another participant proposed shaming communists. Parra Decl. ¶¶ 30–31 & Ex. 1 at GC1_0721, GC1_0764–65. Gonzalez also stated in the chat that the group was "killing her ASAP," along with references to "cyanide" and "Jones town style … group death," which he meant "we're going to kill you jokingly" or "going to kill ourselves in front of her … jokingly." Gonzalez Admin. Hrg. Tr. at 38:8–39:19 (Parra Decl. Ex. 6); Parra Decl. Ex. 2 at GC2_389; Parra Decl. ¶¶ 24, 26–31. But he had no response when asked how someone would know he was joking. Gonzalez Admin. Hrg. Tr. at 39:20–41:6 (Parra Decl. Ex. 6).

### C. Carvajal

Carvajal's discipline rests on his own affirmative conduct, not on membership or association. He did not merely belong to a chat in which others misbehaved. He *created* Group Chat 1, *see* Parra Decl. Ex. 1 at GC1_0001; called it "Homie this is my chat" and was identified by other members as its "head admin" rather than another member, *see id.* at GC1_0253; conducted a poll on whether to admit a prospective member, *id.* at GC1_0244–47; ran polls assigning members new titles and toggled the group's edit-permission settings, *id.* at GC1_0291–93, 687; Carvajal Admin. Hrg. Tr. at 40:2–42:8 (Parra Decl. Ex. 18); activated disappearing messages, Carvajal Admin. Hrg. Tr. at 42:9–44:10; Parra Decl. Ex. 1 at GC1_0805; and performed numerous administrative deletions of other members' messages, Carvajal Admin. Hrg. Tr. at 25:12–28:3, 29:21–30. The Code defines "Assisting" as "Any affirmative act which aids, attempts, promotes, conceals, or facilitates" a prohibited act, Parra Decl. ¶ 16 & Ex. 4, § 5(ii), and these were affirmative acts of creating and running the forum, not passive association.

The record shows that Carvajal created and actively ran the forum, was contemporaneously aware of its generally abusive tenor, and moderated it inconsistently. Carvajal himself acknowledged he "bear[s] some responsibility, cause [he] created a chat," and described his "biggest regret" as having "facilitated this kind of deranged stuff being out there." Parra Decl. ¶¶ 11–12 (quoting Decl. Ex. 3).

FIU's Chief of Police testified that Carvajal created the group and served as administrator, deleted messages but was "a little inconsistent in that practice," so that "by not doing that, it almost makes it seem permissive," Carvajal Admin. Hrg. Tr. at 66:15–67:16 (Parra Decl. Ex. 18), and that the student organizations the University met with viewed him as "an enabler," *id.* at 67:17–68:2. That evidence is not undercut by Carvajal's claim that the flagged messages fell within an approximately "44-hour period where I was not active" in the chat and that he first saw them on a reporter's phone in late February 2026, *id.* at 46:2–47:4, and the identifiable deletions concerned ordinary housekeeping—sticker spam and messages directed at or about himself—not predicate threats, *id.* at 24:17–28:3. FIU disciplined Carvajal based on his own affirmative creation and active administration of the forum, his contemporaneous awareness of its abusive tenor, and his permissive, inconsistent moderation. Those affirmative acts, in this context and on this evidence, satisfy the Assisting provision.

**D. Mojena**

Mojena was disciplined for his own abusive communications, including repeated statements invoking violence against groups of people. He wrote "Total foid death" and, immediately after, "TFD." Parra Decl. ¶ 48 & Ex. 2 at GC2_248. FIU's police chief testified that "foid" is "a slang term for incels referring to women." Mojena Admin. Hrg. Tr. at 43:3–8 (Parra Decl. Ex. 14). Mojena later wrote: "Auto translate: 'WE ARE GOING TO COMPLETELY ERADICATE AND RAPE EVERY BROWNOID.'" Parra Decl. ¶ 47 & Ex. 2 at GC2_102. The

words following "Auto translate" appeared in a message Mojena himself posted, introduced by his own "Auto translate" framing. *See* Parra Decl. Ex. 2 at GC2_102.

Context matters to both statements. FIU does not contend that Mojena literally intended to kill women or carry out the rape and eradication described in his second statement. Mojena himself characterized the "foid" statements in the chat as "lowkey mean." *Id.* at GC2_124. But that does not erase what Mojena himself chose to say. Twice he used group-directed rhetoric invoking extreme violence—death in one instance and rape and eradication in another. The First Amendment question is whether FIU could reasonably respond to those communications under the student-speech framework, not whether Mojena could be convicted of making a criminal threat.

* * *

Accordingly, FIU disciplined Ratchkauskas, Gonzalez, and Mojena for their own communications, and Carvajal for his affirmative conduct facilitating prohibited acts. Gonzalez was also independently disciplined for admitting to drunk driving and drug use on campus and for not complying with his suspension—not for any viewpoint. Their individualized treatment undercuts their premise that FIU imposed content- or viewpoint-based punishment. The President's statement expressed the University's values; it did not drive the disciplinary decisions. ECF 105 ¶ 1. The charges were determined by Devin Parra, who applied particular Code provisions and brought different charges against different students on different facts, Parra Decl. ¶¶ 7–8, 24, 38, 45, 52, 60.

The way the charges were resolved confirms individualized adjudication rather than a predetermined result. Different students faced different charges, the hearing officer sustained some and rejected others, and Gonzalez was found *not* responsible on one charge. Parra Decl. ¶¶ 7–8, 35 & Ex. 7 at 1. And the chats placed before the Court contain offensive racial, religious, and

political expression by numerous participants, yet FIU charged only nine students, under conduct-defined provisions keyed to threats, endangerment, abuse, and the affirmative administration of the forum. Seven were found responsible, including the four Plaintiffs here, and two were found not responsible. Parra Decl. ¶¶ 7–8. That pattern is the signature of conduct-based enforcement, not the suppression of a disfavored viewpoint. A university does not forfeit its authority to discipline threats, endangerment, and abuse every time its president also denounces conduct that does not align with its values.

## II. Plaintiffs Have Not Shown Irreparable Injury.

Plaintiffs claim irreparable injury based on their disciplinary sanctions and an alleged First Amendment chill. Neither claimed injury satisfies the standard here and no evidence supports the alleged chill. The Eleventh Circuit has held that "the absence of a substantial likelihood of irreparable injury …, standing alone, make[s] preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Smith v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, No. 24-12823, 2026 WL 981236, at *2 (11th Cir. Apr. 13, 2026) (per curiam) (cleaned up); *see also Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Here, if Plaintiffs "ultimately prevail[], [their] harm—a delay in completing [their] … education and obtaining a … degree—can be remedied monetarily." *Damsky*, 2026 WL 75122, at *5 (citing *Van Arsdel v. Tex. A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980)). In *Van Arsdel*, "the old Fifth Circuit held that a preliminary injunction was improperly granted to reinstate a former tenured professor who resigned under duress." *Smith*, 2026 WL 981236, at *2 (citing 628 F.2d at 345–46). "Because reinstatement after trial, coupled with back pay, would suffice to redress his alleged wrong, the court determined that

the professor didn't suffer irreparable injury." *Id*. (cleaned up). And so it is here with respect to Plaintiffs. *See Damsky*, 2026 WL 75122, at *5.

Plaintiffs cite (ECF 93 at 10), *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality), which advised that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373. But irreparable injury is presumed in First Amendment cases only if there is "an imminent likelihood that pure speech will be chilled or prevented altogether." *Siegel,* 234 F.3d at 1178.[2] Plaintiffs' reliance on *Elrod* presupposes what Plaintiffs cannot show: "that First Amendment freedoms are actually being diminished." *Parker v. Jud. Inquiry Comm'n of Ala.*, 295 F. Supp. 3d 1292, 1308 (M.D. Ala. 2018). A First Amendment violation "does not automatically require a finding of irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (citation omitted). Because Plaintiffs are unlikely to establish a violation, no presumption attaches.

The requested relief also operates differently across Plaintiffs. For Gonzalez the requested reinstatement would afford no effective relief. Even enjoining the discipline he challenges, he could not return to FIU, because he was separately expelled for failing to comply with his suspension—and relief directed at the challenged findings would not redress that independent sanction, which he does not challenge here. Parra Decl. ¶¶ 60–64; Def.'s Answer to 2d Am. Compl. at 20 (Def.'s Add'l Defenses ¶ 10) (ECF 105). Nor has Gonzalez shown that the continued existence of the challenged disciplinary findings, apart from their effect on his enrollment, will cause irreparable injury before final judgment. Mojena's suspension runs through December 10, 2026—roughly six weeks after the consolidated trial—and bars him from classes and campus

[2] In *Smith*, the Eleventh Circuit applied *Van Arsdel* in the case of a former professor who alleged that her firing constituted, among other things, First Amendment retaliation. *Smith*, 2026 WL 981236, at *1–3.

during that period, Parra Decl. ¶ 49. Ratchkauskas and Carvajal ask the Court to undo completed disciplinary decisions—an expulsion and a suspension, *id.* ¶¶ 42, 57—through affirmative relief whose propriety likewise depends on the merits. ECF 93 at 14. None has shown an irreparable injury on this record.

**III. The Balance of Harms and Public Interest Favors the University.**

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public. Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021).

As an initial matter, the nature of the relief Plaintiffs request further counsels against a preliminary injunction. They do not seek to preserve the status quo; they ask the Court to reinstate expelled and suspended students and to expunge completed findings. Mandatory relief of that kind "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *accord Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (per curiam); *see also Nugent v. Camus*, No. 3:25-CV-170-BL-CWB, 2026 WL 1108897, at *4 (M.D. Ala. Mar. 6, 2026), *R&R adopted,* 2026 WL 1105985 (M.D. Ala. Apr. 23, 2026). The facts and law do not clearly favor Plaintiffs.

This preliminary injunction factor also counsels against relief because Plaintiffs' interests and their alleged harm rest on the merits of their claim. And on this record, their claim lacks merit. On the other side stand paramount interests: protecting students and faculty, preserving a functioning educational environment, responding to concrete disruption, and enforcing neutral student-conduct rules through individualized hearings. Those interests align with universities' "significant interest in ensuring safety and order on campus[.]" *Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011). That interest extends to the behaviors at issue here: alcohol and drug use

and speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy*, 594 U.S. at 188 (quoting *Tinker*, 393 U.S. at 513).

**CONCLUSION**

For these reasons, Plaintiffs' motion for preliminary injunction should be denied.

Dated: October 9, 2026

Respectfully submitted,

*<u>/s/ Edward H. Trent</u>*
Edward H. Trent (FBN 957186)
etrent@schaerr-jaffe.com

*<u>/s/ H. Christopher Bartolomucci</u>*
H. Christopher Bartolomucci (*pro hac vice*)
cbartolomucci@schaerr-jaffe.com
Justin A. Miller (*pro hac vice*)
jmiller@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136

*Counsel for Defendant Jeanette M. Nuñez*